1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    TRIC TOOLS, INC.,                          Case No.  12-cv-03490-JST

           Plaintiff,

8
                                                **ORDER CONSTRUING CLAIMS OF**
9        v.                                     **UNITED STATES PATENT NOS.**
                                                **6,305,880; 6,524,031; 6,793,442; AND**
10   TT TECHNOLOGIES, INC., et al.,             **7,217,065**

           Defendants.

11

12          On March 4, 2014, the Court held a hearing for the purpose of construing disputed terms in

13   the claims of United States Patent Nos. 6,305,880; 6,524,031; 6,793,442; and 7,217,065.  Now,

14   after consideration of the arguments and evidence presented by the parties, and the relevant

15   portions of the record, the Court construes the terms as set forth below.

16   **I.      BACKGROUND**

17          Plaintiff-Counterclaimant Defendant TRIC Tools, Inc. ("TRIC") filed this action against

18   Defendants-Counterclaimants TT Technologies, Inc. and Tracto-Technik GmbH & Co., KG

19   (collectively "TT"), asserting infringement of TRIC's United States Patent Nos. 6,305,880 ("the

20   '880 patent"), 6,524,031 ("the '031 patent"), and 6,793,442 ("the '442 Patent").  First Am.

21   Compl., ECF No. 57.  TT denied infringement and counterclaimed for infringement of United

22   States Patent Nos. 7,125,001 ("the '001 Patent") and 7,217,065 ("the '065 Patent") and

23   declaratory judgment of non-infringement, invalidity, and unenforceability of TRIC's patents.

24   Am. Answer and Counterclaims, ECF No. 60.

25          The parties identified twelve terms construction of which is "likely to be most significant

26   to resolving the parties' dispute," pursuant to Patent Local Rule 4-1(b).  Joint Claim Construction

27   and Prehearing Statement, ECF No. 74, at 2:12-3:12.  In compliance with the Court's order, the

28

United States District Court
Northern District of California

parties later stipulated to reduce the number of terms to ten.[1]  ECF No. 90.

## II.   LEGAL STANDARDS

### A.   Claim Construction

The construction of terms found in patent claims is a question of law to be determined by the Court.  Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996).  "[T]he interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim."  Phillips v. AWH Corp., 415 F.3d 1303, 1316 (Fed. Cir. 2005) (quoting Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).  Consequently, courts construe claims in the manner that "most naturally aligns with the patent's description of the invention."  Id.

The first step in claim construction is to look to the language of the claims themselves.  "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'"  Phillips, 415 F.3d at 1312 (quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc., 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  A disputed claim term should be construed in light of its "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  Phillips, 415 F.3d at 1312.  In some cases, the ordinary meaning of a disputed term to a person of skill in the art is readily apparent, and claim construction involves "little more than the application of the widely accepted meaning of commonly understood words."  Id. at 1314.  Claim construction may deviate from the ordinary and customary meaning of a disputed term only if (1) a patentee sets out a definition and

_____

[1] As a matter of case management and pretrial procedure, it is well established that district courts have the authority only to construe those terms they deem likely to lead to a dispositive outcome at any one claim construction hearing.  See, e.g., Microstrategy Inc. v. Bus. Objects Americas, 410 F. Supp. 2d 348, 355 (D. Del. 2006) aff'd, 238 Fed. Appx. 605 (Fed. Cir. 2007) (construing only two claims of the several the parties had submitted for construction).  District courts may limit the claims parties assert in any given action, provided that a patentee is not permanently deprived of the opportunity to later re-assert claims that present unique issues on liability or damages.  See In re Katz Interactive Call Processing Patent Litig., 639 F.3d 1303, 1310 (Fed. Cir. 2011); Stamps.com, Inc. v. Endicia, Inc., 437 Fed. Appx. 897, 902–03 (Fed. Cir. 2011) (unpublished).

United States District Court
Northern District of California

1  acts as his own lexicographer, or (2) the patentee disavows the full scope of a claim term either in

2  the specification or during prosecution.  <u>Thorner v. Sony Computer Entm't Am. LLC</u>, 669 F.3d

3  1362, 1365 (Fed. Cir. 2012).

4  "Ordinary and customary meaning" is not the same as a dictionary definition:

5  Properly viewed, the 'ordinary meaning' of a claim term is its
6  meaning to the ordinary artisan after reading the entire patent.  Yet
   heavy reliance on the dictionary divorced from the intrinsic evidence
7  risks transforming the meaning of the claim term to the artisan into
   the meaning of the term in the abstract, out of its particular context,
8  which is the specification.

9  <u>Phillips</u>, 415 F.3d at 1321.  Typically, the specification "is the single best guide to the meaning of

10  a disputed term."  <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  It is

11  therefore "entirely appropriate for a court, when conducting claim construction, to rely heavily on

12  the written description for guidance as to the meaning of claims."  <u>Phillips</u>, 415 F.3d at 1315.

13  However, while the specification may describe a preferred embodiment, the claims are not

14  necessarily limited only to that embodiment.  <u>Id.</u>

15  Finally, courts may consider extrinsic evidence in construing claims, such as "expert and

16  inventor testimony, dictionaries, and learned treatises."  <u>Markman</u>, 52 F.3d at 980.  Expert

17  testimony may be useful to

18  provide background on the technology at issue, to explain how an
19  invention works, to ensure that the court's understanding of the
   technical aspects of the patent is consistent with that of a person of
20  skill in the art, or to establish that a particular term in the patent or
   the prior art has a particular meaning in the pertinent field.

21  <u>Phillips</u>, 415 F.3d at 1318.  However, extrinsic evidence is "less reliable than the patent and its

22  prosecution history in determining how to read claim terms."  <u>Id.</u>  If intrinsic evidence mandates

23  the definition of a term that is at odds with extrinsic evidence, courts must defer to the definition

24  supplied by the former.  <u>Id.</u>

25  **B.    Indefiniteness**

26  A patent specification must "conclude with one or more claims particularly pointing out

27  and distinctly claiming the subject matter which the applicant regards as [the] invention."  35

28

U.S.C. § 112(b).  "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  <u>Nautilus, Inc. v. Biosig Instruments, Inc.</u>, 134 S. Ct. 2120, 2124 (2014).

### C.      Means-Plus-Function Claims

The 1952 Patent Act authorizes functional claiming:

> [a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112(f).  This provision is "intended to permit use of means expressions without recitation of all the possible means that might be used in a claimed apparatus."  <u>O.I. Corp. v. Tekmar Co.</u>, 115 F.3d 1576, 1583 (Fed. Cir. 1997).  But the other side of this coin is that the "statutory provision was meant to preclude the overbreadth inherent in open-ended functional claims . . . which effectively purport to cover any and all means so long as they perform the recited functions."  <u>Halliburton Energy Servs., Inc. v. M-I LLC</u>, 514 F.3d 1244, 1256, n.7 (Fed. Cir. 2008).  The "duty to link or associate structure to function is the *quid pro quo* for the convenience of employing § 112(f)."  <u>Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.</u>, 412 F.3d 1291, 1300-02 (Fed. Cir. 2005).

"A challenge to a claim containing a means-plus-function limitation as lacking structural support requires a finding, by clear and convincing evidence, that the specification lacks disclosure of structure sufficient to be understood by one skilled in the art as being adequate to perform the recited function."  <u>Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.</u>, 336 F.3d 1308, 1319 (Fed. Cir. 2003).

"A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims," and "like claim construction, [it] is a question of law."  <u>Atmel Corp. v. Info. Storage Devices, Inc.</u>, 198 F.3d 1374, 1378 (Fed. Cir. 1999).  Therefore, it is appropriate for the Court to address indefiniteness issues at the claim

United States District Court
Northern District of California

4

construction stage.  See Exxon Research and Eng'g Co. v. United States, 265 F.3d 1371, 1376 (Fed. Cir. 2001).

## III.    ANALYSIS

### A.    Patent Number 6,305,880

The '880 patent relates to a device and method for trenchless replacement of underground pipe by splitting existing pipe and pulling cable through the existing pipe in order to perform the replacement.  Some methods of pipe replacement employ components that can weigh two to five tons, and that are powered by "heavy duty equipment, cranes, trucks, and back-hoes, etc.  They also need large excavations, such that the support equipment can take up enough room so as to create traffic problems and even require street closures."  '880 patent, col. 1:44–50.  Prior art trench replacement technology is also very expensive, so its use has been limited primarily to large contractors working on municipal or corporate supply and sewer lines of the six-inch size or larger.  Id. 51–58.  By contrast, the equipment of the invention is of "modular design and needs no bolting, or tools to assemble," fits in a smaller excavation hole, and is smaller and lighter.  Id. 2:4–22.  Claims 18 and 19 of the '880 patent recites:

### Claim 18

A device for the trenchless replacement of in-situ pipe, comprising:
a mole;

a length of cable, said cable being engagable to said mole;

a cable pulling device including a cable engagement mechanism and a cable pulling device engagement means functioning to provide a mounting structure for said cable pulling device;

said cable pulling device engagement means further including a reaction plate having an enlarged surface for disbursing a reaction force against a cable pulling force generated by said cable pulling device;

a cable pulling frame, said cable pulling frame being mountable to said reaction plate and said cable pulling device being mountable to said cable pulling frame; and

wherein said cable engagement mechanism includes at least one pair of cable engaging **collets** that function to engage said cable on a said pulling stroke and to release said cable on a said recovery stroke, and at least one further pair of **collets** that function to engage said

5

cable on said recovery stroke and to release said cable on said pulling stroke, and wherein said cable pulling device is formed with **a slotted cable insertion structure for the sideways insertion of said cable within said cable pulling device**.

Claim 19

A device as described in claim 18 wherein said cable pulling frame includes a plurality of frame members and a rotatable cable pulley being mounted to said frame members; and wherein said frame members are disposed to provide a **cable engagement path in relation to said frame, such that said cable can be sideways mounted within said cable pulling frame and around said pulley and into said cable pulling device**.

The parties have identified three disputed terms in the '880 patent as most significant to resolving the parties' dispute, which terms are shown in boldface in the claims reproduced above.

### 1.    "collets" (Claim 19 of the '880 patent)

| Disputed Claim Term | TRIC's Proposed Construction | TT's Proposed Construction |
|---|---|---|
| "collets" | "cable gripping devices with movable elements which allow for cable slippage when clamping force is released" | "symmetric sleeves that have inner surfaces with ridges cut in a saw-toothed manner to create a one-way cable engagement surface and tapered outer surfaces opposite the inner surfaces for sliding against corresponding tapered surfaces of external fixtures to wedge the sleeves together" |

TRIC's proposed construction broadly equates "collets" as "cable gripping devices[2] with movable elements which allow for cable slippage when clamping force is released." TT proposes to narrow the scope of the term "collets" further, requiring that they be "symmetric," have "ridges cut in a saw-toothed manner," and have "tapered outer surfaces."

Absent certain limiting circumstances, a patentee is entitled to the full breadth of claim scope supported by the claims and specification. 3M Innovative Props. Co. v. Tredegar Corp., 725 F.3d 1315, 1325 (Fed. Cir. 2013) (citing TI Grp. Auto. Sys. (North Am.), Inc. v. VDO North Am., L.L.C., 375 F.3d 1126, 1138 (Fed. Cir. 2004)).  Therefore, "while [courts] construe the claims in

---

[2] The construction of "cable gripping device" is discussed in Part III.C.2, *infra*.

light of the specification, limitations discussed in the specification may not be read into the claims." Id. at 1321.  That the patent teaches a particular embodiment is not by itself sufficient to limit claim scope to the particular embodiment.  See, e.g., Acumed LLC v. Stryker Corp., 483 F.3d 800, 807–08 (Fed. Cir. 2007) (finding a claimed "transverse" hole not limited to the particular "perpendicular" orientation in the specification); Agfa Corp. v. Creo Prods., Inc., 451 F.3d 1366, 1375–76 (Fed. Cir. 2006) (finding a claimed "stack" of printing plates not limited to the particular stack in the specification).

TT's proposed construction impermissibly reads limitations from the specification into the claims.  There is no indication in the claims that the "collets" must be "symmetric," have "ridges cut in a saw-toothed manner," or have "tapered outer surfaces."  Those limitations are imported exclusively from a single embodiment in the patent.  The Federal Circuit has repeatedly cautioned the district courts not to read limitations from the specification into the claims.  Acumed, 483 F.3d at 808.  There is no indication that TRIC meant to limit "collet" to the embodiment depicted in the patent.  Indeed, the specification discloses that "various collet designs are suitable."  '880 patent, col. 15:42–43.

TT argues that the patent shows only a single embodiment, and that embodiment contains the limitations set forth in TT's proposed construction.  This argument is not persuasive:

> [The Federal Circuit] has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.  Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using "words or expressions of manifest exclusion or restriction."

Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004) (citations omitted).

TT's prosecution disclaimer argument is also unavailing.  For prosecution disclaimer to attach, Federal Circuit precedent "requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable."  TecSec, Inc. v. Int'l Bus. Machs. Corp., 731 F.3d 1336, 1346 (Fed. Cir. 2013) (quoting Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1325–26 (Fed. Cir. 2003)).  In contrast, ambiguous prosecution history statements do not warrant

United States District Court
Northern District of California

7

United States District Court
Northern District of California

a disclaimer.  <u>SanDisk Corp. v. Memorex Prods., Inc.</u>, 415 F.3d 1278, 1287 (Fed. Cir. 2005).  It is true that in the patent examiner interview summary of the '880 patent, the patentee distinguished its "collets" from "gripping jaws" in the prior art.  ECF No. 82-5 ("Applicants' representative and Examiner discussed novelty of at least two pairs of cooperating collets versus gripping jaws in the art of cable pulling.").  But there is no evidence that "symmetry," "ridges cut in a saw-toothed manner," or "tapered outer surfaces" are what differentiates "collets" from "gripping jaws."

Having little intrinsic evidence supporting its construction, TT relies on its expert's declaration and a general-purpose dictionary definition.  TT's expert advances the Collins English Dictionary (11th ed. 2011) definition of "collet" as "an externally tapered sleeve made in two or more segments and used to grip a shaft passed through its center when the sleeve is compressed by being inserted into a tapered hole."  Dornfeld Decl., ECF No. 81 ¶ 19.  Even assuming that this is an instance where resort to a general purpose dictionary is helpful or appropriate, this dictionary definition is a poor fit with TT's own construction.  Two of TT's proposed limitations — "symmetric" and "ridges cut in a saw-toothed manner" — are not present in that definition.  And the definition introduces another limitation — "used to grip a shaft" — that takes the definition outside the scope of the '880 patent, because the collets of the '880 patent do not grip a shaft, but a cable.  These inconsistencies confirm that TT's construction inappropriately reads into the claim term limitations from the specification.  And a quick glimpse at other dictionaries demonstrates that "collets" can have a broader meaning, such as "an encompassing band or ring."  Oxford English Dictionary (3rd ed. 2010).

TT's reliance on inventor testimony for the "ridges cut in a saw-toothed manner" limitation is similarly unpersuasive.  The Federal Circuit "has often repeated that inventor testimony is of little probative value for purposes of claim construction."  <u>E-Pass Techs., Inc. v. 3Com Corp.</u>, 343 F.3d 1364, 1370 (Fed. Cir. 2003).  In any case, Mr. Carter's testimony on this point is ambiguous, as he testified that "teeth" are "not necessary" because "[t]here's other ways to do it, too," just before apparently contradicting himself in testifying that the cable gripping device of his invention "won't pull to 30 tons without the teeth."  Carter Depo., ECF No. 82-3 at 57–58.

The Court adopts TRIC's proposed construction.

2.     **"a slotted cable insertion structure for the sideways insertion of said cable within said cable pulling device" (Claim 19 of the '880 patent)**

| Disputed Claim Term | TRIC's Proposed Construction | TT's Proposed Construction |
|---|---|---|
| "a slotted cable insertion structure for the sideways insertion of said cable within said cable pulling device" | "one or more slots are provided to enable the cable to be inserted sideways into the device" | This claim limitation falls within 35 U.S.C. § 112(f) and covers only the corresponding structure expressly disclosed within the specification:[3]<br><br>"a slotted cable insertion structure configured for sideways insertion of a cable into an assembled frame with no intervening structure" |

The parties disagree about whether the term "a slotted cable insertion structure for the sideways insertion of said cable within said cable pulling device" is governed by 35 U.S.C. § 112(f), which requires construing it as a means-plus-function limitation. TRIC maintains that the claim contains sufficient structure such that it is not governed by § 112(f). TT argues that this term is so vague and unclear that it must fall under § 112(f), and even if it does not, one of ordinary skill in the art must look to the specification for a meaning to avoid indefiniteness under § 112(a).

The "failure to use the word 'means' creates a rebuttable presumption that the drafter did not intend the claims to be governed by § 112[(f)]." Flo Healthcare Solutions, LLC v. Kappos, 697 F.3d 1367, 1373 (Fed. Cir. 2012). "[T]he presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome." Id. at 1374. "When the claim drafter has not signaled his intent to invoke § 112[(f)] by using the term 'means,' [courts] are unwilling to apply that provision without a showing that the limitation essentially is devoid of anything that can be construed as structure." Id. "[Courts] will not apply § 112[(f)] if the limitation contains a term that 'is used in common parlance or by persons of skill in the pertinent art to designate structure.'"

---

[3] In the parties' Joint Claim Construction and Prehearing Statement, TT argued that this term falls under 35 U.S.C. § 112(f). ECF No. 74 at 7. In its claim construction brief, however, TT simply argues that this term is so vague and unclear that its construction must be confined to the disclosed embodiments. ECF No. 81 at 23:11–13. The Court addresses both of TT's arguments.

United States District Court
Northern District of California

1    Id.

2         It is possible to view unadorned terms such as "structure," "device," and "mechanism" as

3    "nonce" words or verbal constructs that are not recognized as the names of structures but simply

4    substitutes for "means for." Welker Bearing Co. v. PHD, Inc., 550 F.3d 1090, 1096 (Fed. Cir.

5    2008).  However, surrounding claim language can add sufficient structure to avoid a § 112(f)

6    construction. Flo, 697 F.3d at 1374.  In Flo, for example, the Federal Circuit held that "height

7    adjustment" adds sufficient structure to "mechanism," so that one of ordinary skill in the art

8    recognizes the structure of a "height adjustment mechanism" without resorting to § 112(f).

9    Similarly, here, "slotted cable insertion" modifies "structure," providing sufficient context for one

10   of ordinary skill in the art to understand that the structure is a slot for the sideways insertion of the

11   cable.  The Court thus finds that the claim is not governed by § 112(f).

12        Turning to construction of the term, the Court is not persuaded that the term is so vague

13   and unclear that embodiments from the specification must be read into the claim to save it from

14   indefiniteness. CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1367 (Fed. Cir. 2002)

15   (holding that a claim term will not have its ordinary meaning only if the term chosen by the

16   patentee "so deprives the claim of clarity" as to require resort to the other intrinsic evidence for a

17   definite meaning).  "Slotted cable insertion" connotes sufficient structure, and limitations

18   discussed in the specification thus may not be read into the claims.

19        The parties' proposed constructions are similar, but TT's proposed construction

20   impermissibly reads the limitation "with no intervening structure" into the claims.  TT's only

21   argument in support of limiting the scope of the term in this manner is that the specification

22   discloses "open sides in the collets and cable pulling device, all of which show no intervening

23   structure to prevent the sideways insertion of the cable."  ECF No. 81 at 23.  TT looks to the

24   figures and descriptions of the figures as evidence that the "slotted cable insertion structure"

25   cannot have any intervening structure.  TT also relies on inventor testimony that is both of "little

26   probative value" for purposes of claim construction and ambiguous.  See E-Pass, 343 F.3d at

27   1370; Carter Depo. at 70–71.  As discussed above, reading limitations from the specification into

28   the claims in this manner is inappropriate; the patentee is entitled to the full scope of the claims in

the patent.  See Acumed, 483 F.3d at 808.  Moreover, the specification teaches that the "slotted cable insertion structure" is to be contrasted with other methods of cable insertion where it is "necessary to thread an end of the cable through the cable pulling device."  '880 patent, col. 7:42–43.  Nothing in the specification suggests an intention on the part of the drafter to disclaim embodiments that contain intervening structure.

By contrast, TRIC's proposed construction — "one or more slots are provided to enable the cable to be inserted sideways into the device" — arises directly from the claims themselves.  Because TT's proposed construction impermissibly adds the "no intervening structure" limitation, the Court adopts TRIC's proposed construction.

### 3. "cable engagement path in relation to said frame, such that said cable can be sideways mounted within said cable pulling frame and around said pulley and into said cable pulling device" (claim 19 of the '880 Patent)

| Disputed Claim Term | TRIC's Proposed Construction | TT's Proposed Construction |
|---|---|---|
| "cable engagement path in relation to said frame, such that said cable can be sideways mounted within said cable pulling frame and around said pulley and into said cable pulling device" | "both the frame and the pulling device are configured so that the cable can be positioned within the apparatus without the need to 'thread' the cable through the apparatus like the eye of a needle" | "cable engagement path in relation to said frame, such that said cable can be mounted entirely within the cable pulling frame and around said pulley and into the assembled cable pulling device from the side with no intervening structure" |

The parties dispute the proper construction of the term "cable engagement path in relation to said frame, such that said cable can be sideways mounted within said cable pulling frame and around said pulley and into said cable pulling device."

TT first argues without explanation that the word "path" falls under § 112(f).  The Court disagrees.  The claim does not suggest the term "path" is a substitute for "means for," see Welker Bearing, 550 F.3d at 1096, and the absence of the word "means" creates a rebuttable presumption that the drafter did not intend Claim 18 to be governed by § 112(f).  Flo, 697 F.3d at 1373.  TT has not rebutted that presumption.

Turning to construction, TT's proposed construction impermissibly reads "entirely" and

11

"with no intervening structure" into the claims.  TT contends that the term is so vague and unclear that embodiments from the specification must be imported to save it from indefiniteness under § 112(a).  But TT's proposed construction does not clarify the purported vagueness.  It merely requires the cable to be mounted entirely within the cable pulling frame and prohibits any intervening structure.  Such a construction identifies one possibility of how the cable engagement path can be built by one of ordinary skill, but does not clarify what the cable engagement path is.  Instead, this construction imports limitations from the specification into the claims.  As explained above, a patentee is entitled to the full breadth of claim scope supported by the claims and specification.  3M, 725 F.3d at 1325.  Thus, "limitations discussed in the specification may not be read into the claims."  Id. at 1321.

TT's proposed construction also ignores the context of the term itself.  It is the "frame members" which are "disposed to provide a cable engagement path in relation to said frame, such that said cable can be sideways mounted within said cable pulling frame and around said pulley and into said cable pulling device."

The Court is satisfied that TRIC's proposed construction construes the term by reference to the disclaimers actually contained in the specification and the context of Claim 18 itself.  Therefore, the Court adopts TRIC's proposed construction.

**B.  Patent Number 6,524,031**

The '031 patent also relates to a device and method for trenchless replacement of underground pipe.  It is a continuation of the '880 Patent.  Claim 23 of the '031 patent recites:

<u>Claim 23</u>

A method [as described in claim 22] for the trenchless replacement of in-situ pipe having a first end and a second end, comprising the steps of:

disposing a cable through said pipe between said first end and said second end;

engaging a mole to said cable at said first end;

engaging a **cable pulling means** to said cable at said second end;

pulling said mole through said pipe utilizing said **cable pulling**

United States District Court
Northern District of California

**means** in a series of cyclic strokes including a pulling stroke and a recovery stroke; and

engaging said cable with a first cable engagement device on a cable pulling stroke, and engaging said cable with a second cable engagement device on a recovery stroke; and

wherein said **cable pulling means** includes a **cable pulling device** and a frame having said **cable pulling device** mounted thereto; and

wherein said step of engaging a **cable pulling means** to said cable includes the further step of placing said frame upon a side surface of said cable after said cable has been disposed through said pipe.

'031 patent *Inter Partes* Reexamination Certificate, March 18, 2008.  In the '031 Patent, the parties have identified two disputed terms as most significant to resolving the parties' dispute, which terms are shown in boldface in the claim reproduced above.

> 1. **"cable pulling device"**[4] **(Claim 23 of the '031 Patent)**

| Disputed Claim Term | TRIC's Proposed Construction | TT's Proposed Construction |
|---|---|---|
| "cable pulling device" | "a device for engaging and pulling a cable with a series of cyclic strokes" | This claim limitation falls within 35 U.S.C. § 112(f) and covers only the corresponding structure expressly disclosed within the specification:<br><br>"a device for pulling cable that at least includes, in addition to the first and second cable engagement devices, two parallelly disposed identical hydraulic pistons that move together laterally and wedge the cable engagement devices against the cable and pull the cable" |

The parties disagree about whether the term "cable pulling device" is governed by 35 U.S.C. § 112(f).  TRIC contends that the claim recites sufficient structural language to avoid means-plus-function characterization.  TT maintains that the term is so vague and unclear that it must fall under § 112(f).  According to TT, the word "device" is a "nonce" word and the modifier "cable pulling" merely recites the function of the device.

As previously noted, the Court recognizes that words such as "device" may be construed as

---

[4] "Cable pulling device" appears in both the '880 and '031 Patents.  Since the arguments are briefed in the context of the '031 Patent, the Court construes the term in this context.

"nonce" words in certain circumstances.  Welker, 550 F.3d at 1096.  However, this is not one of those circumstances.  In Welker, the disputed term was "a mechanism for moving said finger."  Id.  The word "mechanism" was not modified by other terms to constitute a term of common technical parlance.  Id.  Instead, it was merely followed by the functional description "for moving said finger."  Id.  The situation here is more similar to that in Flo.  In Flo, the word "mechanism" was modified by "height adjustment," which has a "reasonably well-understood meaning as a name for a structure."  697 F.3d at 1373–74.  "While [a modifier] qualifies the recited 'mechanism' with a function or purpose, a drafter's decision to define a particular mechanism in functional terms is not sufficient to convert a claim element containing that term into a 'means for performing a specified function' within the meaning of section 112[(f)]."  Id. at 1374 (internal citations omitted).  This is because "many devices take their names from the functions they perform," and "'height adjustment mechanism' is just such a term."  Id. (internal citations omitted).

The Court finds that "cable pulling device" is also such a term.  "Cable pulling" modifies "device" to give it a "reasonably well-understood meaning as a name for a structure."  That structure is further defined by Claim 23 itself — a cable pulling means, including a first and second cable engagement device, that engages a cable with a series of cyclic strokes.  The specification notes that the "cable puller may be any of several such pulling devices as have been built by any of several companies . . . ."  '031 patent, col. 7:62–64.

For the same reason, the Court rejects TT's argument that "cable pulling device" is so vague that a person of ordinary skill in the art could only understand the term by looking to the specification to ascertain a definite meaning.

Further, while the specification describes a "cable pulling device" as "*preferably* formed with two parallelly disposed hydraulic pistons," '031 patent, col. 7:23–24 (emphasis added), nothing in the specification disclaims other types of cable pulling devices.

Nevertheless, TRIC's proposed construction is too broad.  The Background section of the specification explains that "[t]here are several methods of . . . pulling a new pipe through an existing pipe.  The most commonly used methods are large cable winches, and/or rod pushers or pullers that are usually hydraulically powered, and often used with a pneumatic percussive device

14

helping to drive the pipe breaking device." Id. 1:33–39.  The invention improves upon, and therefore disclaims, both large cable winches and rod pusher/pullers, which can weigh too much and can be too heavy for a single person to operate.  "They [the prior art] also need large excavations, such that the support equipment can take up enough room so as to create traffic problems and even require street closures."  Id. 1:49–52.  Because of these limitations, the patent explains that the prior art technology was limited "mainly to the 6 inch or above size pipe of municipal or corporate supply and sewer lines, and is used mainly by large contractors."  Id. 1: 58–60.

By contrast, the '031 Patent claims a "modular design" trench replacement device that "needs no bolting, or tools to assemble" and that will "fit into an excavation hole that is 2 feet wide and 3.5 feet long, for the small pullers (24 tons) and 2'x4.5 feet long for the largest puller (75+ tons)."  Id. 2:6–12.  The specification explains that the "cable puller **120** may be any of several such pulling devices, as have been built by any of several companies, and have been used for a number of years as post tensioning devices for post tensioning steel cable or rod, such as rebar, in concrete structures, and for tensioning bridge cable, in the bridge building industry."  Id. 7:62–8:1.  The patent gives as an example of such a device the bridge cable tensioning device used in the bridge construction industry and manufactured by Chowder Machine Company.  Such devices, called

> Post Tensioning Rams (PTR), have never before been used to pull a length of cable, for pulling or lifting objects; this use has heretofore been assigned to winches, and/or block and tackle, and chain hoists. *In the present invention* the PTR is used for pulling the mole using varying lengths and size of cable from a few feet, to several thousand feet and the pulling force is not affected by cable length.

Id. 8:6–12 (emphasis added).  This passage is an affirmative attempt to define the "cable pulling device" of Claim 23.  See Thorner, 669 F.3d at 1365–66 (discussing claim construction principles in light of patentee acting as "own lexicographer").  The passage continues:

> Such PTR devices are light weight as compared to their pulling capability, generally pulling in excess of ½ ton per pound of weight, such that a 70 pound device **120** can place a 35 ton pulling force on the cable **70**.  The PTR in the present invention uses high pressure

hydraulics (5,500 to 20,000 PSIG) to give the intense pulling power it delivers, and the PTR's light weight and **20** portability, are the result of using high pressure hydraulics in small hydraulic cylinders. Typical prior art winches, etc., that produce such force levels can themselves weigh 2-5 tons. *Thus a significant advantage of the present invention* is the use of the light weight bridge cable tensioning device as a cable pulling device **120**, which allows a single man to install and operate the present invention in the small hole **32**.

Id. 8:13–25 (emphasis added). Separately, the specification provides: "*The preferred cable pulling device of the present invention* is a hydraulic bridge cable tensioning device that operates in a cyclic cable pulling manner, having repeatable short pulling strokes." Id. 11:43–46. Finally, the specification concludes:

The significant advantages of the *present invention* are its relatively small, light weight components which allow a single operator to transport, install and operate the device for trenchless replacement of underground pipe. The larger pulling force generated by the PTR cable pulling device allows it to pull the mole through pipe of varying diameters and composed of virtually any pipe material, whether it be fracturable (such as cast iron or ceramic) or malleable (such as steel) . . . .

Id. 16:33–42 (emphasis added).

The repeated characterization of "the present invention" in these passages, both in affirmative terms and as contrary to the other structures known in the prior art, is particularly relevant because "[w]hen a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention. Verizon Servs. Corp. v. Vonage Holdings Corp., 503 F.3d 1295, 1308 (Fed. Cir. 2007) (citations omitted); see also Regents of Univ. of Minn. v. AGA Med. Corp., 717 F.3d 929, 936 (Fed. Cir. 2013) (characterization of "present invention" as containing two separate disks required limitation that disks be separate); SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1343 (Fed. Cir. 2001) ("[T]he characterization of the coaxial configuration as part of the 'present invention' is strong evidence that the claims should not be read to encompass the opposite structure.").

The Court concludes that the specification expressly limits the scope of the term "cable pulling device" to post tensioning devices. Thus, the Court adopts the following modified version

16

1  of TRIC's proposed construction: "a post tensioning device for engaging and pulling a cable with

2  a series of cyclic strokes."

3         **2.**    **"cable pulling means" (Claim 23 of the '031 patent)**

| Disputed Claim Term | TRIC's Proposed Construction | TT's Proposed Construction |
|---|---|---|
| "cable pulling means" | "the combination of a cable pulling device and a supporting frame" | This claim limitation falls within 35 U.S.C. § 112(f) and covers only the corresponding structure expressly disclosed within the specification:<br><br>"a device for pulling cable that at least includes a frame, in addition to the first and second cable engagement devices, a frame and two parallelly disposed identical hydraulic pistons that move together laterally and wedge the cable engagement devices against the cable and pull the cable" |

13        As with "cable pulling device," TT argues that the term "cable pulling means" is either

14  governed by § 112(f) or that it must be narrowly construed to encompass only the specific

15  embodiments of the patent to avoid indefiniteness under § 112(a).

16        TT is correct that the use of the word "means" invokes the presumption of finding a term

17  as a means-plus-function term.  However, this presumption is rebuttable.  "[W]hen a claim recites

18  a function 'but then goes on to elaborate sufficient structure, material, or acts within the claim

19  itself to perform entirely the recited function, the claim is not in means-plus-function format even

20  if the claim uses the term means.'"  <u>Flo</u>, 697 F.3d at 1373.

21        Claim 23 provides structure for the term "cable pulling means," as it expressly defines the

22  term as follows: "said cable pulling means includes a cable pulling device and a frame having said

23  cable pulling device mounted thereto."  Because of this clear recitation, and in light of the Court's

24  construction of "cable pulling device" above, the Court finds that this term is not governed by §

25  112(f).  Instead, the Court agrees with TRIC that Claim 23 leaves no doubt as to the definition of

26  "cable pulling means," which is simply the combination of the "cable pulling device" and a

27  "frame."  Therefore, the Court adopts TRIC's construction.

28

United States District Court
Northern District of California

**C.  Patent Number 6,793,442**

The '442 patent also relates to a device and method for trenchless replacement of underground pipe.  It is a continuation of the '031 Patent.  Independent Claim 1 and Dependent Claim 7 of the '442 patent recite:

<u>Claim 1</u>

A device for the trenchless replacement of in-situ pipe, comprising:

a mole;

a length of cable, said cable being engagable to said mole;

a cable pulling system being **releasably engagable** to said cable;

said cable pulling system including a **cable engaging device**, a reaction plate and a frame portion that includes a cable **pulley**;

said cable engaging device including a first **cable gripping device** for engaging said cable in a cable pulling stroke, and a second **cable gripping device** for engaging said cable following said cable pulling stroke;

said frame portion including frame members for supporting said cable pulley and said reaction plate; said reaction plate including an edge portion having a cable insertion slot formed therein for the passage of said cable therethrough; and said **frame members being configured such that said cable pulling system is adaptable for the sideways insertion of said cable into said cable insertion slot and onto said pulley**.

<u>Claim 7</u>

A device for the trenchless replacement of in-situ pipe as described in claim 1, wherein said reaction plate is a generally flat member that is **releasably engagable** with said frame members.

In the '442 Patent, the parties have identified four disputed terms as most significant to resolving the parties' dispute, which terms are shown in boldface in the claims reproduced above.

**1.     "pulley" (Claim 7 of the '442 patent)**

| Disputed Claim Term | TRIC's Proposed Construction | TT's Proposed Construction |
|---|---|---|
| | | |

| "pulley" | "a rotatable member which contacts a cable to guide the direction of the cable axis" | "a wheel with a grooved rim in which a cable can run in order to change the direction or point of application of a force applied to the cable" |
|---|---|---|

The parties' proposed constructions for the term "pulley" are similar, but with two significant differences.  Unlike TRIC, TT proposes that a pulley must both be a "wheel" and have a "grooved rim."

There is no intrinsic evidence defining the term "pulley" in the '442 patent.  Consequently, the Court must turn to extrinsic evidence, which here is dispositive.

TT's expert, a mechanical engineer, states that a pulley is a "basic component of mechanical engineering."  Dornfeld Decl. ¶ 10.  Dr. Dornfeld supplies a technical definition of "pulley" taken from the McGraw-Hill Dictionary of Scientific and Technical Terms (6th ed. 2003): — "A wheel with a flat, round, or grooved rim that rotates on a shaft and carries a flat belt, V-belt, rope, or chain to transmit motion and energy."  On that basis, TT proposes limiting "pulley" to "a wheel."

"Courts may rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents."  3M, 725 F.3d at 1321.  The definition supplied by Dr. Dornfeld comports with the use of the term "pulley" throughout the patent.  The evidence supplied by Dr. Dornfeld is uncontested by TRIC.  Instead, TRIC argues solely that pulleys that are "non-circular, eccentric (non-centered axis), fractional (i.e., partial rather than fully circular), non-grooved, etc., are all modifications of pulleys that are well known to mechanics and engineers, as well as ordinary people without technical knowledge."  ECF No. 89 at 6.  TRIC, however, does not support that assertion with any evidence.  Moreover, it is not clear that a "non-circular" or "eccentric" pulley would not qualify as a "wheel."  TRIC does not address this point.

However, TT's proposal to further limit the term "pulley" to "a wheel *with a grooved rim*" is supported only by the particular embodiment in the specification and contradicted by the definition TT's expert relies upon, which contemplates rims that may be flat or round as well.  For that reason, the Court will utilize the "wheel" limitation, but not the "grooved rim" one.

19

Regarding the function of the wheel, the Court finds the phrase "point of application of a force applied to the cable" in TT's proposed construction potentially confusing. TRIC's proposed construction of "guid[ing] the direction of the cable axis" is clear and comports with the dictionary definition supplied by TT.

Consequently, the Court adopts part of each parties' proposed construction, and construes "pulley" as "a wheel which contacts a cable to guide the direction of the cable axis."

### 2.   "cable gripping device" (Claim 7 of the '442 patent)

| Disputed Claim Term | TRIC's Proposed Construction | TT's Proposed Construction |
|---|---|---|
| "cable gripping device" | "a device which engages a cable during or following a pulling stroke" | This claim limitation falls within 35 U.S.C. § 112(f) and covers only the corresponding structure expressly disclosed within the specification:<br><br>"a device for gripping cable that at least includes two symmetric 'collets' or sleeves that have inner surfaces with "ridges . . . cut in a saw-toothed manner to create a one-way cable engagement surface" and that have tapered outer surfaces opposite the inner surfaces and an external fixture with corresponding tapered surfaces which passively slide against the collets and wedge the collets together to engage the cable" |

As with other terms discussed above, the parties disagree about whether the term "cable gripping device" is governed by § 112(f). TRIC contends that a cable gripping device is well known in the art and can take several suitable forms. TT argues that the modifier "cable gripping" is merely a recital of the function performed by the claimed device, warranting § 112(f) treatment. Alternatively, TT argues that this term is so vague and unclear that it must be narrowly construed to cover only the embodiments in the specification to avoid indefiniteness under § 112(a).

As explained above, when "means" is not recited, the strong presumption against invoking § 112(f) is not easily overcome. Flo, 697 F.3d at 1374. Also, "a drafter's decision to define a particular mechanism in functional terms is not sufficient to convert a claim element containing that term into a 'means for performing a specified function' within the meaning of section

United States District Court
Northern District of California

112[(f)]."  Id. at 1374 (internal citations omitted).  This is because "many devices take their names from the functions they perform."  Id.

The Court finds "cable gripping device" is one such device.  "Cable gripping" modifies "device" to give it a "reasonably well-understood meaning as a name for a structure."  As TRIC puts it, "A cable gripping device is a device for gripping a cable."  ECF No. 79 at 6.  The specification, for example, refers to "collets" as an embodiment of a device that could engage the cable.  See, e.g., '442 patent at col. 4:19–23 ("The cable pulling device **120** includes a cable pulling collet which releasably engages the cable for repeatable short pulling strokes."); 7:24 ("a cable engaging collet of the cable puller"); 7:49–51 ("A plurality of cable pulling collets **560** are removably engaged within the cable passage slot **550** of the forward end fixture **528**.").  One of ordinary skill in the art would thus understand the "broad class of structures" encompassed by the term "cable gripping device."  See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc., 711 F.3d 1348, 1365 (Fed. Cir. 2013), cert. denied, 134 S. Ct. 900 (2014) (quoting Lighting World, Inc. v. Birchwood Lighting, Inc., 382 F.3d 1354, 1360 (Fed. Cir. 2004)) (holding that the Federal Circuit "require[s] only that the claim term be used in common parlance or by ordinarily skilled artisans to designate *sufficiently definite* structure, 'even if the term covers a broad class of structures.'").

TT has not overcome the presumption against invoking § 112(f).  As such, the Court finds that TT's construction impermissibly defines the term "cable gripping device" exclusively in terms of its embodiments.

The Court therefore adopts TRIC's proposed construction:  "a device which engages a cable during or following a pulling stroke."

> **3.**  **"frame members being configured such that said cable pulling system is adaptable for the sideways insertion of said cable into said cable insertion slot and onto said pulley" (claim 7 of the '442 patent)**

| Disputed Claim Term | TRIC's Proposed Construction | TT's Proposed Construction |
|---|---|---|

United States District Court
Northern District of California

| "frame members being configured such that said cable pulling system is adaptable for the sideways insertion of said cable into said cable insertion slot and onto said pulley" | "the part of the frame portion that supports the reaction plate and the pulley allows the cable to pass sideways into the device" | This claim limitation falls within 35 U.S.C. § 112(f) and covers only the corresponding structure expressly disclosed within the specification:[5]<br><br>"frame members being configured for the sideways insertion of a cable into said cable insertion slot and onto said pulley within an assembled frame with no intervening structure" |
|---|---|---|

The parties disagree about whether the term "frame members being configured such that said cable pulling system is adaptable for the sideways insertion of said cable into said cable insertion slot and onto said pulley" is governed by § 112(f).  TRIC maintains that § 112(f) treatment is unwarranted because the statutory language "means" is absent.  TT argues that the term is so vague and unclear that it must fall under § 112(f), and even if it does not, one of ordinary skill in the art must incorporate limitations from the specification to avoid indefiniteness under § 112(a).

The Court declines to invoke § 112(f) here, since TT has failed to convincingly demonstrate that the term lacks anything that can be construed as structure.  In fact, TT's argument is self-contradictory because its proposed construction does not instill structure — it merely requires the lack of any intervening structure.  TT's argument that the term is so vague and unclear that one must incorporate limitations to avoid indefiniteness fails for the same reason.

On the other hand, the Court does not find TRIC's construction to be superior.  It does not clarify the term any more than TT's proposed construction does, and it abandons limitations contained in the claim language itself.  In particular, TRIC's construction allows for the "sideways insertion" of the cable "into the device," but the claim recites the "sideways insertion" of the cable "onto said pulley."  In addition, TRIC's construction may be confusing to a jury because it is not grammatically equivalent to the term being construed.

---

[5] In the Joint Claim Construction and Prehearing Statement, TT argued that this term falls under 35 U.S.C. § 112(f).  Joint Claim Construction and Prehearing Statement 6:4-13, ECF No. 74.  In its Claim Construction Response Brief, however, TT simply argues that this term is so vague and unclear that its construction must be confined to the disclosed embodiments.  Claim Construction Response Brief 16:24-17:23, ECF No. 81.  The Court addresses both of TT's arguments.

22

By contrast, TT's proposed construction adopts the claim language itself, but adds the limiting phrase "within an assembled frame with no intervening structure."  There is no support in the claim language for the added phrase, and TT does not explain from where it adopts the "assembled frame limitation," or why there must not be "intervening structure."  The Court will thus strike those limitations.

Finally, the Court notes that, at oral argument, TRIC conceded that the patent discusses "sideways insertion" in the context of disclaiming the need to "thread" cable:

> A generally U-shaped cable passage slot, generally denoted by the numeral **550** is formed in each of the front end block **536**, forward end fixture **528** and the rear end fixture **514**, such that the cable **70** can be installed within the cable pulling device **120** from its side. That is, it is not necessary to thread an end of the cable **70** through the cable pulling device **120**.

'442 patent at col. 7:42–48.  The Court thus partially adopts TT's proposed construction, as follows: "frame members being configured for the sideways insertion of a cable into said cable insertion slot and onto said pulley without threading the end of the cable through the cable pulling device."

### 4. "releasably engagable" (Claim 7 of the '442 patent)

| Disputed Claim Term | TRIC's Proposed Construction | TT's Proposed Construction |
|---|---|---|
| "releasably engagable" | "can be released from the part it engages" | "slideably engageable without fixation (e.g. bolts) and removable without the use of tools" |

The parties dispute the meaning of "releasably engagable."  Based on the specification, TT proposes a construction that requires the absence of bolts or the use of tools.  TRIC's proposed construction simply redefines the term with a different word order.

The claim language does not define the term "releasably engagable."  The Court must look to intrinsic evidence to determine the ordinary meaning of the claim term, which is "its meaning to the ordinary artisan after reading the entire patent."  Phillips, 415 F.3d at 1321.  Typically, the

1  specification "is the single best guide to the meaning of a disputed term." <u>Vitronics</u>, 90 F.3d at

2  1582.

3       "Releasably engagable" appears twice in Claim 7, which incorporates Claim 1. First, the

4  cable pulling system is releasably engagable to the cable. Second, the reaction plate is releasably

5  engagable with the frame members. The cable pulling system engages the cable through the cable

6  gripping devices. The first cable gripping device engages the cable in the cable pulling stroke, and

7  the second cable gripping device engages the cable after the cable pulling stroke. The

8  specification describes this engagement as using collets to grab the cable and pull it rearwardly,

9  and later releasing the cable. '442 patent at col. 8:40–47. As for the reaction plate, the

10  specification describes it as having frame engagement holes that allow for insertion of the frame's

11  pins. <u>Id.</u> at 6:65–7:1. The specification also makes clear that the invention does not require

12  bolting or tools for assembly. <u>Id.</u> at 2:8–9. Further, the specification provides examples of the

13  opposite of what "releasably engagable" means: when an element is "fixedly engaged," it can be

14  engaged by bolting or welding. <u>Id.</u> at 9:38–45. The construction of "releasably engagable" must

15  encompass the above descriptions, while avoiding the impermissible reading of limitations from

16  the specification into the claims.

17       The Court finds that TRIC's proposed construction is impermissibly broad. It covers

18  engagement by fixation such as bolting, which is expressly disclaimed by the specification. The

19  Court also finds that "slideably" in TT's proposed construction would not adequately describe the

20  relationship between the cable gripping devices and the cable. Therefore, the Court partially

21  adopts TT's proposed construction, as follows: "engageable without fixation (e.g., bolting or

22  welding) and removable without the use of tools."

23       **D.  Patent Number 7,217,065 — "retention feature" (Claims 19, 22, 23)**

24       The '065 patent relates to a modular pipe breaking assembly. Claim 19 of the '065 patent

25  recites:

26                    Claim 19

27       A pipe breaking device, comprising:
     a base unit;

28       a **retention feature** located on the base unit;

a cable attachment portion located at a first end of the base unit;

a pipe gripping device having a wedge and at least one wedge mating portion; and

a number of pipe engaging elements wherein the pipe engaging elements are retained on the base unit by the **retention feature**, and wherein the number of pipe engaging elements are removable from the base unit.

The parties have identified one disputed term as most significant to resolving the parties' dispute over the '065 patent, which term is shown in boldface above.

| Disputed Claim Term | TRIC's Proposed Construction | TT's Proposed Construction |
|---|---|---|
| "retention feature" | "an opening in a load spreading plate by which the plate can be grasped manually" | "a structural element that keeps one or more other elements in place" |

TRIC argues that "retention feature" is indefinite because it appears only in the claims but not in the specification. TT contends that the term is not a technical term and its meaning is readily apparent to one of ordinary skill in the art.

TRIC's indefiniteness argument ignores the rule that originally filed claims in a patent application constitute a part of the disclosure:

> [E]arly opinions suggest the Patent and Trademark Office was unwilling to find written descriptive support when the only description was found in the claims; however, this viewpoint was rejected. See In re Koller, 613 F.2d 819, 823 (C.C.P.A. 1980) (original claims constitute their own description); accord In re Gardner, 475 F.2d 1389 (C.C.P.A. 1973); accord In re Wertheim, 541 F.2d 257 (C.C.P.A. 1976). It is now well accepted that a satisfactory description may be in the claims or any other portion of the originally filed specification.

Manual of Patent Examining Procedure 2163.I.B (8th ed. Rev. 9, Aug. 2012). Indeed, the patents TRIC itself asserts in this case utilize claim terms that do not appear in the specification. For example, the term "cable gripping device," construed above, does not appear anywhere in the '442 Patent's specification. TRIC also provides no argument supporting its proposed construction.

In some situations, the ordinary meaning of a disputed term to a person of skill in the art is

readily apparent, and claim construction involves "little more than the application of the widely accepted meaning of commonly understood words." Phillips, 415 F.3d at 1314.  This is such a case.  As TT argues, "retention" is defined as "retaining or holding fixed in some place, position, or condition," Webster's Third New International Dictionary (2002); Privratsky Decl., Ex. B, ECF No. 80-2, or "the act of retaining; the state of being retained," Merriam-Webster's Collegiate Dictionary (l lth ed. 2011); Privratsky Decl, Ex. C, ECF No. 80-2.  "Feature" means "the makeup, structure, form, or outward appearance of a person or thing," "something that goes to make up something else; element, part, constituent," Webster's Third New International Dictionary (2002); Privratsky Decl., Ex. D, ECF No. 80-2, or "the structure, form, or appearance esp[ecially] of a person," Merriam-Webster's Collegiate Dictionary (l lth ed. 2011); Privratsky Decl, Ex. E, ECF No. 80-2.

When one of ordinary skill in the art reads the term in conjunction with the specification, it is clear that the "retention feature" of Claim 19 refers to the "shoulder" in Figure 1, also called the "retaining ring" or a "stopping feature" in the specification — that is, "a structural element that keeps one or more other elements in place." '065 patent, Fig. 1; col. 2:13–23.  The Court thus adopts TT's proposed construction: "a structural element that keeps one or more other elements in place."

## IV.   CONCLUSION

For the foregoing reasons, the Court construes the disputed claim language as follows:

| Claim | Term | Construction |
|---|---|---|
| **'880 Patent** | | |
| 19, 20 | "collets" | "cable gripping devices with movable elements which allow for cable slippage when clamping force is released" |
| 19, 20 | "a slotted cable insertion structure for the sideways insertion of said cable within said cable pulling device" | "one or more slots are provided to enable the cable to be inserted sideways into the device" |

| Claim | Term | Construction |
|-------|------|-------------|
| 19, 20 | "cable engagement path in relation to said frame, such that said cable can be sideways mounted within said cable pulling frame and around said pulley and into said cable pulling device" | "both the frame and the pulling device are configured so that the cable can be positioned within the apparatus without the need to 'thread' the cable through the apparatus like the eye of a needle" |
| **'031 Patent** | | |
| 23 | "cable pulling device" | "a post tensioning device for engaging and pulling a cable with a series of cyclic strokes." |
| 23 | "cable pulling means" | "the combination of a cable pulling device and a supporting frame" |
| **'442 Patent** | | |
| 7 | "pulley" | "a wheel which contacts a cable to guide the direction of the cable axis" |
| 7 | "cable gripping device" | "a device which engages a cable during or following a pulling stroke" |
| 7 | "frame members being configured such that said cable pulling system is adaptable for the sideways insertion of said cable into said cable insertion slot and onto said pulley" | "frame members being configured for the sideways insertion of a cable into said cable insertion slot and onto said pulley without threading the end of the cable through the cable pulling device." |
| 7 | "releasably engagable" | "engagable without fixation (e.g., bolting or welding) and removable without the use of tools" |
| **'065 Patent** | | |
| 19, 22, 23 | "retention feature" | "a structural element that keeps one or more other elements in place" |

**IT IS SO ORDERED.**

Dated:  June 23, 2014



_____
JON S. TIGAR
United States District Judge